JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

|  |  |
|---|---|
| | ) Case No.: EDCV 20-00131-CJC(KKx) |
| MARTHA PEDROZA, | ) |
| | ) |
| Plaintiff, | ) MEMORANDUM OF DECISION |
| v. | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

I.   INTRODUCTION

Plaintiff Martha Pedroza initiated this negligence action against Defendant United States of America under the Federal Tort Claims Act for injuries she sustained when she was struck by a United States Postal Service (USPS) mail delivery truck.  Having considered the evidence, the parties' objections to the evidence, the credibility of the trial

witnesses, and both parties' arguments at trial, the Court finds in favor of Plaintiff and awards her damages in the total amount of $677,744.

## II.    FINDINGS OF FACT

### A.    Plaintiff's Prior Accident and Injuries

On December 1, 2017, Plaintiff was involved in a motor vehicle accident.  (Trial Transcript, Day Two, Volume One [hereinafter "D2 V1"] at 130:5-7.)  After the accident, Plaintiff went to Pomona Valley Hospital and complained of pain in her neck, or cervical spine, and lower back, or lumbar spine.  (Ex. 501.)  In July 2018, Plaintiff was diagnosed with sciatica in her lumbar spine.  (Exs. 508, 509; D2 V1 at 133:12-15.)  Plaintiff received epidural injections in her lumbar spine to treat her sciatica.  (D2 V1 at 19:4-8.)  Plaintiff received her final lumbar spine epidural injection in December 2018.  (*Id*. at 134:20-23.)  Plaintiff's lumbar spine and cervical spine pain had subsided prior to January 22, 2019.  (*Id*. at 8:24-25, 9:11-13; 19:4-8, 91:3-7.)

### B.    The Incident

On January 22, 2019 between 5:00 PM and 6:00 PM, Plaintiff was struck by a USPS mail delivery truck driven by then USPS employee Enri De Rosas in a parking lot outside of Plaintiff's place of employment, Victory Outreach, located at 250 W. Arrow Highway, San Dimas, California (the "Incident").  (Ex. 108; Dkt. 55 [hereinafter "Stipulated Facts"] ¶¶ 1, 3.)  At the time of the Incident, Mr. De Rosas was employed by USPS and acting within the scope of his employment.  (Stipulated Facts ¶¶ 5-6.)  For reference, an image of the parking lot outside of Victory Outreach is reproduced below:



(*See* Ex. 112.)

The bottom of the above image is the north side of the parking lot.  (Ex. 108.)  The top of the image is the south side of the parking lot.  (*Id.*)  Victory Outreach is on the east side of the parking lot (or the left-hand side of the above photo).  Before the Incident, Mr. De Rosas was delivering mail to Victory Outreach.  (Ex. 108; Trial Transcript, Day One, Volume Two [hereinafter "D1 V2"] at 21:22-22:13.)  When Mr. De Rosas made the delivery, it was already dark outside.  (Trial Transcript, Day Two, Volume Two [hereinafter "D2 V2"] at 54:2-4.)  Before exiting his vehicle to deliver the mail, Mr. De Rosas parked his mail delivery truck on the west side of the parking lot, parallel to the front side of Victory Outreach, facing south.  (*See* Ex. 108; Trial Transcript, Day One, Volume One [hereinafter "D1 V1"] at 60:14-18; D2 V2 at 56:21-57:1.)

Plaintiff, then 56 years old, held the door open for Mr. De Rosas so that he could enter the Victory Outreach building to deliver the mail.  (D1 V2 at 22:6-18, 13:1.)  Plaintiff was wearing dark clothing on the evening of the Incident.  (D2 V2 at 88:2-3.)  After allowing Mr. De Rosas to enter, Plaintiff walked away from the Victory Outreach building and into the parking lot while Mr. De Rosas was still in the building.  (D1 V2 at 22:19-24; D2 V2 at 63:22-25.)   After leaving from the Victory Outreach building,

Plaintiff stopped to converse with some coworkers in front of the building on the east side of the parking lot.  (D2 V2 at 64:12-17, 66:7-15; Ex. 115.)  Mr. De Rosas exited Victory Outreach and passed the Plaintiff and her coworkers to head towards his mail delivery truck.  (D2 V2 at 64:10-17.)  At some point, Plaintiff headed towards her car as well, which was parked on the west side of the parking lot, south of where Mr. De Rosas had parked his mail delivery truck.  (D1 V2 at 27:15-22; D2 V2 at 59:13-18; Ex. 114.)  In order to get to her car, Plaintiff had to pass in front of the mail delivery truck.  (D1 V2 34:2-5.)

When Mr. De Rosas got back to his mail delivery truck, he turned on the engine and headlights and moved forward.  (D2 V2 at 67:14-21.)  Before he started the mail delivery truck and moved the vehicle forward, Mr. De Rosas was wearing a headlamp that was turned on.  (D2 V2 at 75:6-8; Ex. 108.)  The light from the headlamp reflected off the mail truck's windshield.  (D2 V2 at 75:10-12; Ex. 108.)  The light reflecting off the windshield prevented Mr. De Rosas from clearly seeing what was in front of his vehicle.  (D2 V2 at 75:13-15; Ex. 108.)

When Mr. De Rosas moved the mail truck forward, it struck Plaintiff on her right side as she passed in front of it.  (D1 V2 at 27:15-22; Ex. 108.)  The mail truck weighs 3,050 pounds.  (Stipulated Facts ¶ 8.)  The mail truck dragged Plaintiff ten feet across an asphalt surface as she was pinned under the front-left of the vehicle's bumper.  (D1 V2 at 35:23-25; Ex. 108; D1 V1 at 21:15-23:18.)  The dragging ripped a hole in Plaintiff's blouse and left behind a roughly ten-foot skid mark of Plaintiff's skin and clothing.  (D1 V1 21:15-23:18, 86:1-4; Ex. 108.)  Mr. De Rosas had to back up his mail truck so that Plaintiff could get out from underneath the truck's bumper.  (D2 V2 at 69:17-70:5.)

## C.    Plaintiff's Injuries, Treatment, and Cost of Treatment

### 1.    Plaintiff's Superficial Injuries and Initial Care

After being struck by the mail delivery truck, Plaintiff remained on the ground for some time.  (*See* Ex. 101.)  At the scene, Plaintiff complained of pain to her hand, back, head, and right shoulder.  (*See id*.; Ex. 108.)  An ambulance then transported Plaintiff to Pomona Valley Hospital.  (Ex. 149.)  The ambulance cost Plaintiff $2,234, which her insurance paid.  (Stipulated Facts ¶ 11.)  Pictures of Plaintiff taken at the hospital and shortly after she left the hospital reveal that Plaintiff suffered numerous soft tissue injuries, including bruising and abrasions to her right shoulder, left forearm, left forehead, back of head, left ear, right hand, left buttock, and back.  (Exs. 118, 121, 124, 126, 127, 132, 134, 135, 136, 137, 140.)  The abrasion between Plaintiff's shoulder blades—a ten-inch by four-inch road rash—was especially pronounced.  (Exs. 108, 137.)  Immediately after the Incident, Plaintiff had trouble raising her right arm.  (D1 V1 at 111:23-112:2.)

Plaintiff was given various medical services at Pomona Valley Hospital, including medical evaluations and several X-Rays and CT scans.  (Exs. 516, 519-525.)  Of note here, Pomona Valley Hospital performed a CT scan of Plaintiff's cervical spine.  (Ex. 520.)  The scan showed that Plaintiff's cervical spine was normal.  (*Id*.)  Plaintiff incurred $54,087.58 in bills for the medical services provided at Pomona Valley Hospital, which her insurance paid.  (Stipulated Facts ¶ 9.)  Plaintiff was discharged from Pomona Valley Hospital on January 23, 2019, the day after the Incident.  (Ex. 527.)

The next day, on January 24, 2019, Plaintiff received an evaluation from her primary care physician, Dr. Lorindha Argudo.  (Ex. 528.)  Dr. Argudo explained that Plaintiff complained of pain in her neck, back, and shoulder.  (*Id*.)  Dr. Argudo did not, however, order any treatment for these symptoms.  (*Id*.)  On January 26, 2019, Plaintiff

went to San Dimas Community Hospital Emergency Room because she was lightheaded and vomiting.  (Ex. 530.)  San Dimas Community Hospital noted that Plaintiff had full range of motion in her neck.  (*Id*.)  Plaintiff was discharged from San Dimas Community Hospital the same day with no recommendations for treatment to her neck, back, or shoulders.  (*Id*.)  Plaintiff incurred $1,002.40 in bills for these follow up medical services, which her insurance paid.  (Stipulated Facts ¶¶ 10, 12.)

## 2.    Plaintiff's Treatment with Healthpointe Medical Group

On February 5, 2019, Plaintiff commenced a long course of treatment with several doctors at Healthpointe Medical Group.  She began with Dr. Cristian Santizo.  (D2 V1 at 136:14-18.)  Dr. Santizo conducted X-rays on Plaintiff's thoracic and lumbar spine and ordered an MRI to Plaintiff's lumbar spine.  (Dkt. 544.)  He also recommended Plaintiff commence physical therapy for her lumbar spine and right shoulder and undergo a psychological evaluation.  (*Id*.; *see also* Ex. 539 at 6.)  Dr. Santizo charged Plaintiff $2,126.27 for his services.  (Ex. 203 at 14.)

From February 2019 to March 2019, Plaintiff underwent physical therapy with Dr. Ferdinand Lopez for pain in her lower back and right shoulder.  (Ex. 203 at 6-7; *see also* Ex. 539 at 6.)  Plaintiff also commenced psychiatric treatment with a Dr. Derrig in March 2019.  (D2 V1 at 27:2-9.)  Dr. Derrig assisted Plaintiff in dealing with the emotional trauma stemming from the Incident.  (*Id*. at 27:13-28:18.)  At the time, Plaintiff was having nightmares and trouble sleeping.  (*Id*. at 27:22-28:3.)  Plaintiff's psychiatric treatment ended in May 2019.  (Ex. 203 at 12.)  Plaintiff's psychiatric treatment cost $6,700.  (Ex. 203 at 12, 21.)

Plaintiff underwent an MRI for her lumbar spine on February 15, 2019, as well as an MRI for her right shoulder on February 20, 2019.  (Ex. 162.)  The total cost for these

MRIs was $8,050.  (*Id*.)  On March 20, 2019, Dr. Michael Chuang rendered an evaluation of Plaintiff.  (Ex. 539.)  Plaintiff came to Dr. Chuang complaining of pain in her mid-back, lower-back, and right shoulder.  (*Id*. at 2.)  In his evaluation, Dr. Chuang noted that there were no issues with Plaintiff's cervical spine and left shoulder.  (*Id*. at 3-4.)  He noted several issues with Plaintiff's right shoulder and lumbar spine.  (*Id*. at 4-5.)  Dr. Chuang diagnosed Plaintiff with radiculopathy, or sciatica, in her lumbar spine.  (*Id*. at 5.)  He also evaluated the MRI to Plaintiff's right shoulder and noted a full thickness tear at the leading edge of the subscapularis tendon.  (*Id*. at 6.)  At trial, Plaintiff's expert, Dr. Jonathan Frank, noted that the MRI of Plaintiff's right shoulder showed a full thickness tear with no retraction of the tendon and no muscular atrophy, suggesting that the tear in Plaintiff's right shoulder was acute rather than chronic.  (D2 V2 at 15:10-16:7.)  Dr. Chuang recommended that Plaintiff continue with physical therapy and undergo surgery to repair the acute tear in her right shoulder.  (Ex. 539 at 7.)

Plaintiff underwent surgery on her right shoulder on May 13, 2019.  (Ex. 543.)  The right shoulder surgery and corresponding consultations and follow up visits with Dr. Chuang cost Plaintiff $60,355.  (Ex. 164; Ex. 203 at 17[1]; Ex. 203 at 11[2].)  After her surgery, Plaintiff was in significant pain, and she was forced to wear her right arm in a sling for eight weeks, such that she had to rely on her left arm for everyday activities.  (D2 V1 at 17:16-18:24.)  Plaintiff also recommenced physical therapy for her right shoulder from June 2019 to September 2019.  (D2 V1 at 16:7-17; Ex. 203 at 7-10.)  Plaintiff's physical therapy up to this point, including the initial physical therapy ordered by Dr. Santizo and the physical therapy accompanying her right shoulder surgery, cost Plaintiff $7,086.  (Ex. 203 at 6-7.)  Plaintiff's right shoulder surgery and corresponding

[1] The Court includes only those billing entries from Ex. 203 at 17 that correspond to Plaintiff's right shoulder, which end at October 16, 2019.
[2] The Court includes the cost of the services of Dr. Pedro Alupay from March 2019 to May 2019.  (Ex. 203 at 11.)  In his report, Dr. Chuang listed Dr. Alupay as a co-treater for Plaintiff's right shoulder.  (Ex. 539 at 7.)

physical therapy seems to have been successful, as Dr. Chuang evaluated Plaintiff in October 2019 and discharged her, finding that she had full use in both of her shoulders. (Trial Transcript, Day Three, Volume One [hereinafter "D3 V1"] at 68:3-7; *see also* Ex. 203 at 17.)

On June 7, 2019, Plaintiff went to see Dr. Saeed Nick with complaints about pain in her cervical spine and lumbar spine. (Ex. 544 at 5.) Dr. Nick noted some tenderness and muscle spasms in Plaintiff's cervical spine. (*Id*. at 3.) He also noted some tenderness in Plaintiff's lumbar spine with pain radiating from her lumbar spine to her leg. (*Id*. at 5.) Dr. Nick did not order any treatment for the cervical spine, but he did order epidural injections to treat Plaintiff's lumbar spine. (*Id*. at 6.) Thereafter, Plaintiff received three sets of three epidural injections to her lumbar spine. (Ex. 203 at 15-16.) The treatment for Plaintiff's lumbar spine, including consultations with Dr. Nick and the epidural injections, cost $86,249. (Ex. 203 at 15-16; Ex. 172-174.)

On November 21, 2019, ten months after the Incident, Plaintiff had an MRI done for her cervical spine. (Exs. 161, 553.) The MRI showed similar degenerative changes at all levels of Plaintiff's cervical spine and no evidence of nerve impingement. (D3 V1 at 86:25-87:5.) Defendant's expert, Dr. Geoffrey Miller, noted that the MRI appeared to show an average spine for a woman of Plaintiff's age. (*Id*. at 89:4-7.) Nearly a year after her MRI, in October 2020, Plaintiff began receiving treatment for her cervical spine from Dr. Blake Berman. (Ex. 203 at 19.) Plaintiff began receiving epidural injections for her cervical spine in February 2021. (*Id*.) Plaintiff had an additional MRI on her cervical spine in June 2021. (Ex. 159.) Plaintiff incurred $32,275 in medical bills for treatment for her cervical spine, including MRIs, epidural injections, and consultations. (Exs. 159, 161, 176, 203 at 19.)

Plaintiff began to feel pain in her left shoulder in March 2020.  (D2 V1 at 23:17-24:9.)  In June 2020, Plaintiff had an MRI on her left shoulder.  (Ex. 160.)  On August 6, 2020, Plaintiff underwent surgery on her left shoulder with Dr. Chuang.  (Ex. 566.)  After the surgery, Plaintiff commenced physical therapy for her left shoulder from September 2020 to March 2021.  (Ex. 203 at 4-5, 13, 24.)   Plaintiff also received a "Cold Therapy Unit" from Ortho Surgical Care to help her recover from her left shoulder surgery.  (Ex. 181 at 1; D2 V1 at 43:9-20.)  The medical bills associated with Plaintiff's left shoulder, including the MRI, surgery, physical therapy, "Cold Therapy Unit," and various consultations with Dr. Chuang amount to $69,580.78.  (Exs. 160, 166, 181, 203 at 4-5, 13, 17-18, 23-24.)

### D.   Plaintiff's Missed Work

Owing to the medical treatment described above, Plaintiff missed a substantial amount of work at Victory Outreach.  By the Court's count, Plaintiff missed 113 days of work in 2019.  (Ex. 235 at 7.)  Most of the days that Plaintiff missed from work in 2019 were directly after the accident or around the time of her right shoulder surgery.  (*Id.*)  Plaintiff earned $1,378.04 every two weeks in 2019.  (*See* Ex. 232 at 1.)  Plaintiff also missed significant time from work in 2020, mostly around the time of her left shoulder surgery, but also for her lumbar spine epidurals.  (Ex. 235 at 29.)  Plaintiff earned $1,333.27 every two weeks in 2020.  (*See* Ex. 233 at 1.)

\\
\\
\\
\\
\\

### III. Conclusions of Law

Plaintiff asserts a single claim for negligence against Defendant under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1). (Dkt. 1.)  In California, the elements of negligence are duty, breach of duty, causation, and damages.[3]  *Carrera v. Maurice J. Sopp & Son*, 177 Cal.App.4th 366, 377 (2009) (citations omitted).  Defendant did not dispute that Mr. De Rosas owed Plaintiff a duty of care and breached that duty.  (*See, e.g.*, Trial Transcript, Day Four [hereinafter "D4"] at 37:18-20; Dkt. 45 at 6.)  Indeed, drivers like Mr. De Rosas owe pedestrians a duty of ordinary care.  *See Francis v. City & Cty. of San Francisco*, 44 Cal. 2d 335, 339 (1955).  Mr. De Rosas failed to exercise "the care required of a reasonable and prudent person under the existing circumstances" when, on a dark night and knowing that pedestrians were nearby, he began to move his mail truck forward while wearing a headlamp that denied him the ability to clearly see through his windshield.  *See id*.; (*see also* D2 V2 at 75:6-15; Ex. 108.)  Because Mr. De Rosas was employed by Defendant and acting within the scope of his employment when his mail truck struck Plaintiff, (Stipulated Facts ¶¶ 4-5), his negligence is attributable to Defendant.  *See Lewine v. Babbit*, 1994 WL 665142, at *1 (N.D. Cal. Nov. 14, 1994) (explaining that FTCA covers "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the federal government while acting within the scope of his office or employment") (internal quotations and citation omitted).

Defendant does, however, dispute Plaintiff's role in causing the Incident, raising a comparative fault affirmative defense.  Defendant also asserts that Plaintiff's injuries

---

[3] Because the Incident occurred in California, California law applies to Plaintiff's claims.  *See* 28 U.S.C. § 1346(b)(1) (creating governmental liability "in accordance with the law of the place where the act or omission occurred").

were not caused by the Incident and that she incurred unreasonable medical expenses. These issues will be discussed in turn below.

## A.   Comparative Fault

Comparative fault reduces a plaintiff's recovery in proportion to his or her share of fault. *See Li v. Yellow Cab Co. of Calif.*, 13 Cal. 3d 804, 824 (1975). Defendant has the burden of proving Plaintiff's fault. *See Phipps v. Copeland Corp. LLC*, 64 Cal. App. 5th 319, 278 (2021). Defendant has failed to meet that burden and the Court will not reduce Plaintiff's recovery on grounds of comparative fault.

Plaintiff did not behave in a negligent manner before being struck by the mail truck. Defendant failed to prove that Plaintiff stepped in front of the mail truck after Mr. De Rosas had started its engine. (*See* D2 V1 at 128:21-22; D2 V2 at 68:4-8.) And that Plaintiff was wearing dark clothing at night is not, without more, negligent behavior. Further, though it was hardly clear from the record, even if Plaintiff stepped in front of the mail truck after Mr. De Rosas turned on the vehicle's headlights, (*see* D2 V2 at 67:18-20), that would not be negligent behavior. In fact, the fact that a driver has his headlights on is all the more reason for a pedestrian who wants to pass in front of the driver's vehicle to believe that the driver can see her.

The case cited by Defendant in its Trial Brief, *Wittenbach v. Ryan*, 63 Cal. App. 3d 712 (1976), is inapposite. That case dealt with a pedestrian-plaintiff who passed behind a vehicle and was struck by the vehicle as it backed up. *Id*. at 715. The court faulted the plaintiff for not waiting for the defendant to back his vehicle up after having watched the defendant enter his vehicle and "[knowing] that he had to back up." *Id*. at 717. But a vehicle backing up is a markedly different circumstance than a vehicle moving forward. A reasonably prudent pedestrian in a parking lot knows that a driver who is backing their

vehicle up has somewhat impaired visibility as to what is behind his vehicle.  The same does not hold for a pedestrian in a parking lot passing *in front* of a vehicle.  That pedestrian can reasonably expect that the driver knows what is in front of his vehicle and therefore should not have to take the extra cautionary steps described in *Wittenbach*.

## B.   Causation

Plaintiff must prove by a preponderance of the evidence a causal connection between Mr. De Rosas' negligence and her injuries.  *See Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1052 (1991); *Skinner v. Vacaville Unified Sch. Dist.*, 37 Cal. App. 4th 31, 42 (1995).  A tortfeasor must take a plaintiff as she is—even if, by reason of some preexisting condition, the plaintiff is more susceptible to injury than an ordinary person and incurred more harm because of the defendant's conduct than an ordinary person would.  *See Rideau v. Los Angeles Transit Lines*, 124 Cal.App.2d 466, 471 (1954); Judicial Council of California Civil Jury Instruction ("CACI") 3928.   While a plaintiff is not entitled to damages for any preexisting physical or emotional condition, she may recover damages if such condition was aggravated by a defendant's wrongful conduct.  *See* CACI 3927.

The parties do not dispute that Plaintiff's need for immediate medical care in the days after the Incident was the result of Mr. De Rosas' negligence.  (*See, e.g.*, Dkt. 45 at 24.)  After being struck and dragged by a heavy truck, Plaintiff reasonably sought medical attention for the harms caused by the event.  This included Plaintiff's ambulance ride from the scene of the Incident, stay and care at Pomona Valley Hospital Emergency Room, and subsequent visits to her primary care physician and San Dimas Community Hospital Emergency Room.

Defendant does, however, dispute that Mr. De Rosas' negligence caused the injuries for which Plaintiff was treated by Healthpointe Medical Group.  The Court concludes that Mr. De Rosas' negligence caused Plaintiff's right shoulder injury and the aggravation of her preexisting lumbar spine injury.[4]  However, Plaintiff has failed to prove by a preponderance of the evidence that her left shoulder and cervical spine injuries or conditions were caused by Mr. De Rosas' negligence.

### 1.    Right Shoulder and Lumbar Spine

Plaintiff offered persuasive evidence to show that she suffered an acute tear to her right rotator cuff when she was struck by the mail delivery truck.  The truck, weighing 3,050 pounds, (Stipulated Facts ¶ 8), struck Plaintiff and dragged her at least ten feet across an asphalt surface, leaving behind a skid of clothing and skin on the ground, (*See* Ex. 108.)  Dr. Frank testified that it was likely that Plaintiff was attempting to extricate herself from underneath the vehicle while she was being dragged by pushing away from the mail truck with her arms.  (D2 V2 15:7-15.)

The medical evidence presented at trial establishes that Plaintiff's right shoulder injury resulted from the Incident.  Plaintiff complained of pain in her right shoulder immediately after the Incident, both at the scene and with Dr. Argudo on the day following the Incident.  (Exs. 108, 528.)  She also had trouble raising her right arm directly after the Incident.  (D1 V1 at 111:23-112:2.)  Plaintiff's complaints of right shoulder pain also persisted in the months following the Incident.  (Ex. 539 at 2.)  Photos taken at Pomona Valley Hospital also show that Plaintiff sustained bruising on the front of her right shoulder.  (Ex. 118.)  Dr. Frank also testified that an acute tear to the subscapularis tendon in a person's right shoulder would cause internal bleeding in the

---

[4] The Court also concludes that Mr. De Rosas' negligence caused Plaintiff significant emotional trauma, (*see* D2 V1 at 27:22-28:3), for which psychiatric treatment was necessary.

area where Plaintiff had bruising.  (D2 V2 at 14:13-21.)  Plaintiff also received an MRI on her right shoulder on February 20, 2019, less than one month after the Incident.  (Ex. 162.)  In his March 2019 evaluation, Dr. Chuang also explained that the MRI of Plaintiff's right shoulder revealed a full thickness tear at the leading edge of Plaintiff's subscapularis tendon.  (Ex. 539 at 6.)  Dr. Frank also reviewed this MRI and explained that it showed that Plaintiff's tendon had not significantly retracted from the bone.  (D2 V2 at 15:10-16:7.)  Dr. Frank explained that with a chronic, or long-term, rotator cuff injury, one's tendon retracts from the bone, whereas an acute tear is not accompanied by significant retraction.  (*Id*. at 20:8-21:7, 25:22-26:1.)  From Plaintiff's MRI as well as photos from Plaintiff's right shoulder surgery, Dr. Frank concluded that Plaintiff suffered an acute tear in her right shoulder at the time of the Incident.  (*Id*. at 15:16-16:7, 19:2-8.)

Plaintiff has also proven that her lumbar spine injury was aggravated by the Incident.  As explained above, Plaintiff was involved in a motor vehicle accident in December 2017.  (D2 V1 at 130:5-7.)  As a result, Plaintiff developed sciatica in her lumbar spine, diagnosed in July 2018.  (Exs. 508, 509; D2 V1 at 10:10-20.)  Plaintiff received epidural injections to her lumbar spine to treat her sciatica up until December 2018.  (D2 V1 at 19:4-8, 134:20-23.)  However, Plaintiff's lumbar spine sciatica had subsided by the time of the Incident.  (*Id*. at 19:6-8.)

The pain in Plaintiff's lumbar spine then returned and intensified because of the Incident.  Her complaints of lower back pain were immediate.  She complained of back pain at the scene, (Ex. 101), with Dr. Argudo the day following the Incident, (Ex. 528), and at San Dimas Community Hospital on January 26, 2019, (Ex. 530).  Her lumbar spine pain was also much different in nature than the pain she experienced after her 2017 accident.  The pain was greater and it affected a different area of her body, her lower back and right glute, than the area affected after the 2017 accident, her leg and hip.  (D2 V1 at 19:9-16.)

Plaintiff's complaints of lower back pain persisted in the months following the Incident.  (Ex. 539 at 2.)  She received an MRI on her lumbar spine on February 15, 2019, just weeks after the Incident.  (Ex. 533.)  Dr. Chuang discussed various problems with Plaintiff's lumbar spine in his March 2019 evaluation and diagnosed her with sciatica, recommending that she continue her course of physical therapy with Dr. Lopez.  (Ex. 539 at 6-7.)  Plaintiff's sciatica persisted through physical therapy, as she complained to Dr. Nick in June 2019 of sharp pain to her lower back, causing Dr. Nick to order epidural injections for her lumbar spine.  (Ex. 544.)  Dr. Alexander reviewed Plaintiff's February 2019 MRI as well as his own X-rays and noted disc protrusion and disc space narrowing in Plaintiff's lumbar spine.  (D2 V1 at 78:14-16, 80:7-18.)  Dr. Alexander concluded that Plaintiff's injury was caused by the accident, based on his review of the MRI, the degree of Plaintiff's ongoing symptoms, and the fact that her lumbar spine pain had subsided prior to the Incident.  (D2 V1 at 77:20-23, 91:3-7.)

The medical treatment that Plaintiff received relating to her lumbar spine and right shoulder include initial consults with Dr. Santizo, (Ex. 203 at 14), physical therapy with Dr. Lopez, (Ex. 203 at 6-10), MRIs on Plaintiff's lumbar spine and right shoulder, (Ex. 162), right shoulder surgery, (Exs. 164, Ex. 203 at 17), a number of epidural injections to Plaintiff's lumbar spine, (Exs. 172-174, 203 at 15-16), and various office consultations with Dr. Chuang, Dr. Alupay, and Dr. Nick, (Ex. 203 at 11, 15-16, 17.)[5]  As noted by Dr. Alexander, Plaintiff will also require future medical care for her lumbar spine, including visits with her physicians, medication, physical therapy, and further epidural injections.  (D2 V1 at 124:18-125:7; *see also* Ex. 605.)

---

[5] The Court cannot discern from the record to which injury Plaintiff's acupuncture relates.  (*See* Ex. 203 at 1.)  Therefore, she will not recover the reasonable value of the acupuncture.

### 2.     Left Shoulder and Cervical Spine

In contrast to her showing of causation on her right shoulder injury, Plaintiff did not prove by a preponderance of the evidence that her left shoulder injury was causally related to the Incident.  Plaintiff's theory of causation for her left shoulder injury, as testified to by Dr. Frank, is that she injured her left shoulder because she had to overuse it while her right shoulder recovered from surgery.  (D2 V2 at 26:14-21.)  However, in rendering his opinion, Dr. Frank did not know how long Plaintiff's right arm was immobilized after her surgery.  (*Id*. at 42:20-23.)  He further acknowledged that there is no published literature supporting his theory of injury by overuse.  (*Id*. at 43:3-10.)  Further belying Plaintiff's theory is the timing of her complaints regarding her left shoulder.  Plaintiff first complained of pain in her left shoulder in March 2020.  (*Id*. at 41:13-42:8.)  This came well after she had recovered from her right shoulder surgery, as Dr. Chuang concluded that she had full use of both of her arms in October 2019.  (D3 V1 at 68:3-11.)

Similarly, Plaintiff has failed to adequately prove a causal relationship between the Incident and her cervical spine injury.  A CT scan of Plaintiff's cervical spine taken at Pomona Valley Hospital on the evening of the Incident showed that her cervical spine was normal.  (Ex. 520.)  Consistent with the CT scan results, Dr. Chuang also noted that Plaintiff's cervical spine was normal in his March 2019 evaluation.  (Ex. 539 at 3.)  While there is evidence that Plaintiff complained of pain in her neck soon after the Incident, (*see, e.g.*, Ex. 528), no MRI was ordered on Plaintiff's cervical spine until November 21, 2019, ten months after the Incident, (Ex. 553).  On top of that, Plaintiff did not begin receiving epidural injections to her cervical spine until January 2021, (D2 V1 at 29:22-24), and the record does not reflect that Plaintiff received other forms of treatment to her cervical spine prior to the epidural injections.

Dr. Miller's testimony regarding Plaintiff's cervical spine condition was instructive.  Dr. Miller noted that in discussing a cervical spine injury, one must identify a specific level of the cervical spine that appears to be in a worse condition than the others. (D3 V1 at 87:17-25.)  Dr. Miller reviewed the MRI on Plaintiff's cervical spine and noted that no level appeared different than any other.  (*Id.* at 87:23-88:6.)  Dr. Miller concluded that Plaintiff's cervical spine showed multiple-level degeneration, typical for a 56-year-old woman like Plaintiff.  (*Id.* at 87:23-88:2.)  This is somewhat consistent with Dr. Alexander's testimony that he had seen cervical spine conditions like Plaintiff's in patients who had never been in an accident.  (D2 V1 at 121:25-122:2.)

## C.   Damages

Defendant must pay Plaintiff reasonable compensation for the harm it caused her. *See* CACI 3900.  A plaintiff may recover any reasonable charges for past medical treatment that the plaintiff has paid or still owes, *see Williams v. The Pep Boys Manny Moe & Jack of California*, 27 Cal.App.5th 225, 237 (2018), reasonably necessary future medical care, *see Bermudez v. Ciolek*, 237 Cal.App.4th 1311, 1328 (2015), and lost wages, *see* CACI 3903C.

"[A]n injured plaintiff whose medical expenses are paid through private insurance may recover as economic damages no more than the amounts paid by the plaintiff or his or her insurer for the medical services received or still owing at the time of trial."  *Howell v. Hamilton Meats & Provisions, Inc.*, 52 Cal. 4th 541, 566 (2011).  When a plaintiff pays for medical treatment through an insurer, evidence of the full amount billed is inadmissible.  *Corenbaum v. Lampkin*, 215 Cal. App. 4th 1308, 1328-1333 (2013).  However, in cases involving uninsured plaintiffs, courts take a far more holistic approach to determining the reasonable value of medical expenses.  *See Bermudez*, 237 Cal. App. 4th at 1330 (explaining that damages for uninsured plaintiffs "will usually turn on a wide-

ranging inquiry into the reasonable value of medical services provided.")  The court in *Bermudez* explained that in assessing damages for an uninsured plaintiff, courts should assess the "full range" of fees paid in the market and that no part of the full range of fees should be "wall[ed] off."  *Id.* at 1334.  A plaintiff who elects not to use his or her insurance is treated as uninsured for the purposes of calculating damages.  *Pebley v. Santa Clara Organics, LLC*, 22 Cal. App. 5th 1266, 1276 (2018).[6]

Defendant's expert Lindsay Knutson's methodology most accurately captures the reasonable market value for Plaintiff's past and future medical treatment.  Ms. Knutson's methodology is a market value analysis that accounts for what payers and providers are paying and charging in the relevant market.  (Trial Transcript, Day Three, Volume Two [hereinafter "D3 V2"] at 19:20-23.)  In calculating the cost of medical services, Ms. Knutson takes Medicare reimbursement rates and multiplies them by a multiplier that represents what commercial payers typically pay in the market.  (*Id.* at 36:25-41:6.)  Ms. Knutson's methodology relies on comprehensive data from a multitude of reputable sources, including the U.S. Department of Health and Human Services, the American Hospital Association, the American Society of Anesthesiologists, and GoodRX, a website that lists costs at major pharmacies.  (*Id.* at 36:24-41:6, 46:19-47:1, 48:12-22, 49:18-24.)  Ms. Knutson noted that cash-paying patients, like Plaintiff, typically pay the same or less than the amounts paid by commercial payers.  (*Id.* at 21:21-25; 41:7-10.)

The methodologies of Dr. Alexander and Carol Hyland were not as reliable as that of Ms. Knutson.  Dr. Alexander testified that a 25% reduction would be appropriate across the board for Plaintiff's past medical expenses.  (D2 V1 at 92:17-19.)  Dr.

---

[6] Contrary to Plaintiff's assertion in her Trial Brief, *Pebley* did not hold that damages calculations are inadmissible when arrived at through a methodology that makes use of Medicare rates.  (*See* Dkt. 49 at 11-14.)  The court in *Pebley* explained that an uninsured plaintiff's recovery should not be limited "to what [an insurer] (and possibly Medicare) would have paid."  22 Cal. App. 5th at 1277.  But the court never said that those rates cannot be part of the "wide-ranging inquiry" into the reasonable value of medical expenses.

Alexander was unclear on how he arrived at his calculation.  On direct examination, Dr. Alexander made a vague reference to FAIR Health, a publication that "looks at reasonable rates for healthcare around the county," but failed to explain how he made use of this publication in arriving at his 25% reduction.  (D2 V1 at 75:13-18.)  On cross examination, Dr. Alexander acknowledged that he did not refer to FAIR Health or any other publication in this case specifically.  (D2 V1 at 124:14-17.)  In determining the cost of Plaintiff's future medical care, Ms. Hyland relied on the Medical Fee Book.  (D2 V2 at 113:21-25.)  Ms. Knutson pointed out that the Medical Fee Book provides data on the amount providers charge, rather than the amount payers end up paying.  (D3 V2 at 51:14-23.)  But what providers receive is a more accurate representation of the reasonable market value of a medical service than the amount providers hope to receive.

### 1.      Past Medical Care

Plaintiff incurred significant costs for immediate medical care in the days directly after the Incident, including an ambulance ride, care at Pomona Valley Hospital Emergency Room and San Dimas Community Hospital Emergency Room, and a consultation with her primary physician.  These costs, totaling **$57,323.98**, were covered by Plaintiff's insurer.  Defendant does not dispute the reasonableness of those costs.  (Stipulated Facts ¶¶ 9-12.)  Plaintiff will receive the full amount of these costs.

Plaintiff further incurred the following medical bills relating to her emotional trauma, right shoulder injury, and lumbar spine injury after she began treating with Healthpointe Medical Group: $8,050 from Precise Imaging for MRIs of Plaintiff's lumbar spine and right shoulder, (Ex. 162), $44,200 from Orangewood Surgical Center for her right shoulder surgery, (Ex. 164), $60,900 from Orangewood Surgical Center for epidural injections to Plaintiff's lumbar spine (Ex. 172-74), $2,126.27 from Healthpointe Medical Group for initial consultations and evaluations with Dr. Santizo, (Ex. 203 at 14),

$7,086 from Healthpointe for physical therapy related to Plaintiff's lumbar spine and right shoulder, (Ex. 203 at 6-10), $25,349 from Healthpointe for various consultations and treatments relating to Plaintiff's lumbar spine, (Ex. 203 at 15-16), $16,155 from Healthpointe for various consultations and treatments related to Plaintiff's right shoulder, (Ex. 203 at 11, 17), and $6,700 from Healthpointe for psychiatric services, (Ex. 203 at 12, 21).  The Court will not consider the remainder of the bills submitted by Plaintiff because these bills are either related to Plaintiff's cervical spine or left shoulder or Plaintiff failed to clearly tie them to injuries caused by the Incident.

Unfortunately, at trial, Ms. Knutson did not go through the various bills submitted by Plaintiff and opine on the reasonable value of the services described in each bill. Rather, she gave a total reasonable value for all services rendered by each provider.  For example, Ms. Knutson opined that the reasonable value of *all* the bills from Healthpointe totaled $18,329.55.  However, that reasonable total value would cover bills relating to Plaintiff's right shoulder and lumbar spine, for which she will recover, as well as bills relating to her left shoulder and cervical spine, for which she will not recover.  To solve this issue, the Court finds it appropriate to derive a reasonable value percentage from Ms. Knutson's testimony and apply that percentage to the bills that it has deemed causally related to the Incident.

For Healthpointe's bills that are causally related to the Incident, Plaintiff will receive 32.5% of the charged amount.  The 32.5% figure comes from Knutson's total reasonable value of $18,329.55 divided by the total amount charged by Healthpointe as of June 3, 2020 of $56,472.  (*See* D3 V2 at 54:8.)  For Orangewood Surgical Center's bills that are causally related to the Incident, Plaintiff will receive 14% of the amount charged.  (*See id*. at 54:11.)  The 14% figure comes from Knutson's total reasonable value of $18,317.72 divided by the total amount charged by Orangewood Surgical Center as of February 8, 2021 of $130,610.  (*See id*. at 54:10-11.)  And Plaintiff will receive

20% of the amounts charged by Precise Imaging that are causally related to the Incident. (*See id*. at 54:14.)  The 20% figure comes from Knutson's total reasonable value of $2,505.88 divided by the total amount charged by Precise Imaging as of June 2, 2020 of $12,450.  (*See id*. at 54:12-14.)  Thus, Plaintiff will receive $1,610 for her Precise Imaging bills, $14,714 for her Orangewood Surgical Center bills, and $18,660.29 for her Healhpointe bills.  In total, Plaintiff will receive **$34,984.29** for these bills.

## 2.    Future Medical Care

Plaintiff seeks recovery for various types of future medical treatment.  However, Plaintiff failed to produce qualified expert testimony supporting the reasonable necessity of much of this future care, including the "ENT Evaluation," "Multidisciplinary Pain Program," and "Shoulder Corticosteroid."[7]  (*See* Ex. 605 at 8-10.)  Other aspects of Plaintiff's future treatment are not causally related to the Incident, including cervical spine epidurals and cervical spine surgery.  (*Id*.)  Dr. Alexander testified that Plaintiff would need future care for her lumbar spine, including intermittent physical therapy, medication, epidural injections, and follow-up doctor's visits.  (D2 V1 at 125:18-126:7.) He acknowledged that it was somewhat speculative that Plaintiff would need follow up X-rays and MRIs for her lumbar spine.  (*Id*. at 125:8-11.)

Plaintiff will therefore recover for the medical treatments identified in Section A: Physician Visits, Section F: Physical Therapy, and Section I: Lumbar Epidurals in Exhibit 605.  For the reasons explained above, the Court will use Ms. Knutson's reasonable value for these medical services.  Using the values in Exhibit 605 that Ms. Knutson provided, Plaintiff will recover **$63,085.15** for her future medical treatment.

---

[7] It is not enough that Carol Hyland, who is not a medical expert, testified as to what medical experts told her was reasonably necessary.

### 3.      Lost Earnings

Plaintiff will also recover lost earnings for the days she missed from work in 2019 that were causally related to the Incident.  As mentioned above, Plaintiff missed 113 workdays in 2019.  (Ex. 235 at 7.)  Four of those days predate the accident, (Ex. 235 at 7), the record indicates that three days were spent at a "Latin America Conference," six days were only partially missed for a doctor's appointment, and one day was missed for Plaintiff's cervical spine MRI.  (Ex. 235 at 8-25.)  Therefore, only 99 of the missed workdays, or 9.9 two-week pay periods, were causally related to the Incident.  Plaintiff will recover $13,642.60 for lost earnings in 2019, or 9.9 multiplied by Plaintiff's 2019 pay of $1,378.04.

In 2020, Plaintiff missed three days of work for her lumbar spine epidurals.  (Ex. 235 at 30-37.)  The remainder of the workdays Plaintiff missed were for her husband's surgery, cervical spine epidurals, and left shoulder surgery.  (*Id.*)  The Court will therefore award Plaintiff lost earnings for three days in 2020, or 0.3 two-week pay periods.  This amounts to $399.98, or 0.3 multiplied by Plaintiff's 2020 pay of $1,333.27.  In total, Plaintiff will recover **$14,042.58** in lost earnings.

### 4.      Pain and Suffering

A plaintiff is entitled to recover damages for physical pain and for mental suffering from her physical injuries.  *Hilliard v. A. H. Robins Co.*, 148 Cal. App. 3d 374, 413 (1983).  Mental suffering may include any "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal."  *Capelouto v. Kaiser Foundation Hospitals*, 7 Cal. 3d 889, 892–893 (1972).

Loss of enjoyment of life is also a factor in determining pain and suffering damages. *Huff v. Tracy*, 57 Cal. App. 3d 939, 942–944 (1976).

In its trial brief, Defendant argued that Plaintiff's pain and suffering damages should be limited to one-third of economic damages. (Dkt. 45 at 8.) The Court rejects Defendant's attempt to extrapolate a limit from a handful of cases. *See, e.g., Estate of Mary Honda v. United States of America*, No. 15-cv-00317, Dkt. 61 (C.D. Cal. Jan. 20, 2017) (awarding non-economic damages at 1.5 times economic damages). No fixed standard exists for deciding the amount of pain and suffering damages. *See Pearl v. City of Los Angeles*, 36 Cal.App.5th 475, 491 (2019) (internal citations omitted); CACI 3905A. Instead, "jur[ies] [are] entrusted with vast discretion in determining the amount of damages to be awarded." *Plotnik v. Meihaus*, 208 Cal.App.4th 1590, 1602 (2012). The only standard for pain and suffering damages is that they be an amount that "a reasonable person would estimate as fair compensation." *Duarte v. Zachariah*, 22 Cal.App.4th 1652, 1664-1665 (1994) (internal citations omitted).

The Incident took a great physical and mental toll on Plaintiff. Being dragged ten feet against an asphalt surface by a heavy mail truck is both terribly frightening and painful. At the scene of the Incident and at Pomona Valley Hospital afterwards, Plaintiff was clearly traumatized and seemed to be agitated and in significant pain. (Exs. 101, 104-107.) She was reeling from an acute tear in her right shoulder, an aggravation of her lumbar spine sciatica, and serious soft tissue injuries, including a severe abrasion between her shoulder blades. (Ex. 137.) When Plaintiff's family had to change the bandage on the abrasion between Plaintiff's shoulder blades, the pain was excruciating, as Plaintiff felt like they "were tearing [her] skin off." (D1 V2 at 44:13-20.) Immediately after the accident, Plaintiff required help from her family with bathing and cleaning her wounds. (D1 V1 at 106:22-107:3.) In the months after the Incident, Plaintiff was having nightmares and could not sleep. (D2 V1 at 27:22-28:3.)

As described above, Plaintiff has had to undergo extensive medical treatment to treat her right shoulder and lumbar spine, including surgery, physical therapy, and various epidural injections.  This treatment has been painful and disruptive to Plaintiff's life.  For example, after Plaintiff's right shoulder surgery, she was unable to use her right arm for many months.  (*Id*. at 18:15-17.)  The surgery also caused Plaintiff to miss a substantial amount of time from work and prevented Plaintiff from spending time with her family, an activity she greatly values.  (*Id*. at 67:9-14.)

Due to the pain caused by the Incident, Plaintiff has been unable to partake in the hobbies that she used to enjoy frequently, including riding her motorcycle, (*id*. at 54:20-57:17), fishing, (*id*. at 57:19-59:19), and hiking, (*id*. at 59:23-64:3).  Plaintiff also cannot perform some basic tasks without triggering her pain, such as cleaning her home.  (*Id*. at 68:25-69:9.)  Plaintiff's co-worker, Rosanna Carrillo, explained that Plaintiff has slowed down significantly since the Incident and must take frequent breaks during her work.  (D1 V1 at 88:20-89:11.)  Plaintiff's daughter also testified that her mom has slowed down since the Incident and is no longer able to partake in various family activities.  (*Id*. at 122:6-123:22.)  It is obvious that Plaintiff's emotional trauma still lingers, as Plaintiff was unable to speak about the Incident and its aftermath at trial without becoming emotional.  The Court concludes that pain and suffering damages should be awarded at three times Plaintiff's economic damages, or **$508,308.**

\\
\\
\\
\\
\\
\\

**IV.    CONCLUSION**

For the foregoing reasons, the Court finds in favor of Plaintiff and awards her **$677,744** in total damages, or $169,436 for her past and future medical care and lost wages and $508,308 for her pain and suffering.

DATED:        September 27, 2021

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE

CC: FISCAL